IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                      Case No. 2:24-cr-20134-MSN

JARVIS CLAYBORN,

    Defendant.

### ORDER OVERRULING DEFENDANT'S OBJECTIONS, ADOPTING REPORT AND RECOMMENDATION, AND DENYING MOTION TO SUPPRESS

Defendant has moved to suppress the inculpatory statements he made to police, arguing that the midstream *Miranda* warnings he was given were ineffective. (ECF Nos. 36 & 51, collectively, "Motion to Suppress.")  The Court referred Defendant's Motion to Suppress to the Chief Magistrate Judge, who held an evidentiary hearing and issued a Report and Recommendation (ECF No. 56, "Report").  The Report recommended that Defendant's Motion to Suppress be denied.  Defendant filed objections to which the government has responded.

### STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59, a district court may refer a motion to suppress to a magistrate judge for the preparation of a report and recommendation. "The magistrate judge must promptly conduct the required proceedings and enter on the record a recommendation for disposing of the matter, including any proposed findings of fact." Fed. R. Crim. P. 59(b)(1). If a party files timely objections to the recommendation, the district court must consider those objections *de novo* and "accept, reject, or modify the

recommendation." Fed. R. Crim. P. 59(b)(3). Failure to object to a magistrate judge's findings or conclusions results in forfeiture of those objections. Fed. R. Crim. P. 59(b)(2).[1]

"The filing of objections to a magistrate [judge]'s report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985). Therefore, objections to a magistrate judge's report must be "specific." Fed. R. Crim. P. 59(b)(2). Vague, general, or conclusory objections are improper, will not be considered by the reviewing court, and are "tantamount to a complete failure to object." *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001); *see also Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) ("[A] general objection to a magistrate [judge]'s report, which fails to specify the issues of contention, does not satisfy the requirement that an objection be filed. The objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious."); *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004) ("An 'objection' that does nothing more than state a disagreement with a magistrate [judge]'s suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context.") The Court need not review—under a *de novo* or any other standard—those aspects of a report and recommendation to which no objection is made. *Thomas v. Arn*, 474 U.S. 140, 150–52 (1985).

---

[1] Although the text of the Rule 59(b)(2) provides that a failure to object "waives a party's right to review," the Sixth Circuit has clarified that a failure to object is not a waiver, but a forfeiture. *Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019) ("We clarify that forfeiture, rather than waiver, is the relevant term here.") (explaining, "*Thomas v. Arn* held that 'the failure to file objections to the magistrate's report *waives* the right to appeal the district court's judgment,'" but *Arn* preceded the Supreme Court's clarification in *United States v. Olano*, 507 U.S. 725, 733 (1993).) The difference matters because forfeited issues may nevertheless be considered on appeal in certain circumstances. *Id.* (citing *Harris v. Klare*, 902 F.3d 630, 635–36 (6th Cir. 2018)).

## DISCUSSION

A.   **Findings of Fact**

Neither party objects to the Report's findings of fact.  The Court therefore **ADOPTS** the Report's proposed findings of fact in their entirety.

B.   **Conclusions of Law**

Defendant objects to the Chief Magistrate Judge's conclusion that the midstream *Miranda* warnings given to him were effective.  The government says that the Chief Magistrate Judge got it right.

   1.   **Were the *Miranda* warnings effective?**

Both sides agree that the primary issue is whether the midstream *Miranda* warnings given to Defendant were effective such that "a reasonable person in [Defendant's] shoes could have seen the station house questioning as a new and distinct experience," that gave Defendant "a genuine choice whether to follow up on [his] earlier admission."  *Missouri v. Seibert*, 542 U.S. 600, 615–16, (2004).  And the parties agree that the Court applies the multi-factor test announced in *Seibert*, which the Sixth Circuit adopted in *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015) ("*Ray I*"), to make that determination.  Those factors are as follows:

> (1) "the completeness and detail of the questions and answers in the first round of interrogation";
>
> (2) "the overlapping content" of the statements made during the first and second rounds of interrogation;
>
> (3) "the timing and setting of the first and the second" interrogations;
>
> (4) "the continuity of police personnel" in the two rounds of interrogation; and
>
> (5) "the degree to which the interrogator's questions treated the second round as continuous with the first."

*Seibert*, 542 U.S. at 615.

If the court concludes, using the *Seibert* factors above, that the *Miranda* warnings were not effective, then the second statement is inadmissible because it is part "of a single, unwarned sequence of questioning." *Seibert*, 542 U.S. at 612 n.4. But if the *Miranda* warnings were effective, then the "court can take up the standard issue of voluntary waiver and voluntary statement." *Id.*

In the Report, the Chief Magistrate Judge applied the *Seibert* factors and concluded that the *Miranda* warnings given at the police station were effective. (*See* ECF No. 56 at PageID 100.) He then analyzed whether Defendant's post-warning wavier of his *Miranda* rights was "knowing and voluntary," and concluded that it was. (*See* ECF No. 56 at PageID 100–01.) Based on those conclusions, he recommended denying Defendant's Motion to Suppress. (*Id.* at PageID 102.)

Defendant objects to the Chief Magistrate Judge's conclusion and argues that the *Seibert* factors weigh in favor of finding that "a reasonable person in [Defendant's] shoes would not have understood the *Miranda* warnings delivered at the police station to convey a message that he retained a choice about continuing to talk." (ECF No. 64 at PageID 203.) Defendant asserts that his post-warning statements should be suppressed because the Memphis Police Department ("MPD") "has instituted a practice that systematically undermines the constitutional protections guaranteed under *Miranda* and *Seibert*." (ECF No. 64 at PageID 208.)

After a *de novo* review, the Court agrees with the Chief Magistrate Judge's conclusions: "The surrounding circumstances and the entire course of police conduct," *United States v. Woolridge*, 64 F.4th 757, 761 (6th Cir. 2023) (cleaned up), indicate that the *Miranda* warnings here were effective, and Defendant's waiver of his rights was knowing and voluntary.

Although the Sixth Circuit "adopted the *Seibert* plurality's multi-factor test" in *Ray I*, it has also explained that those factors should not be applied as a "rigid test for midstream-*Miranda*

4

cases," or used to conduct "a mechanical counting of items on a list." *Id.* (citations omitted). Ultimately, "the analysis hinges on an encompassing question: Did the *Miranda* warning give the suspect a genuine choice whether to follow up on his earlier admission?" *Id.* (cleaned up).

Turning first to the *Seibert* factors, some of the factors weigh slightly in Defendant's favor, but others weigh against him.[2]

*Completeness and Details of Questions and Answers During the First Round of Interrogation.* At the scene, Officer Collins asked Defendant a couple of questions; he asked about where Defendant was sitting in the car and whether any of the guns or drugs found in the car belonged to Defendant. Defendant argues that Officer Collins's questions "elicited all the information that was necessary to establish that [Defendant] possessed a firearm equipped with a conversion device or 'switch.'" (ECF No. 64 at PageID 203.) But that is not entirely accurate.

---

[2] In *Ray I*, the Sixth Circuit adopted the *Seibert* plurality's "objective approach to midstream *Miranda* warnings, which does not consider the intent of the officer's conduct." *Woolridge*, 64 F.4th at 762. As a result—and as the Chief Magistrate Judge noted— Defendant's argument that the "officers deliberately engaged in a 'question-first, warn-later strategy,'" (ECF No. 64 at PageID 207), is misplaced.

And Defendant walks his argument back a bit, saying it appeared that Officers Collins and Boyd believed that Officer Collins was conducting a "field interview," which would not have required *Miranda* warnings. (*See* ECF No. 64 at PageID 208.) In other words, Defendant suggests that Officer Collins questioning of Defendant may have been based on a misunderstanding of what a field interview could cover, not a deliberate "question-first, warn-later strategy."

But at this point, the Court need not explore the origins of the officers' misunderstanding. It suffices to say that the record does not show that Officer Collins's questioning was part of a strategy to undermine the effectiveness of the later *Miranda* warnings. According to Sergeant Pellet, the MPD does not expect officers to ask a lot of incriminating questions on the scene. (ECF No. 58 at PageID 177.) And the MPD's policy on the detention of suspects clearly directs: "If in doubt as to whether the defendant needs to be advised of *Miranda* rights, give the warnings." (ECF No. 64-1 at PageID 211.)

Although the Sixth Circuit does not have a pattern instruction for a violation of 18 U.S.C. § 922(o), two other circuits' pattern instructions require that the government prove the following two elements beyond a reasonable doubt: (1) the defendant possessed a "machine gun," and (2) the defendant knew it was a "machine gun" or was aware of the firearm's essential characteristics that made it a "machine gun." *See* Pattern Crim. Jury Instr. 5th Cir., 2.43I Possession of a Machinegun (2024); Eleventh Circuit Pattern Jury Instr., Criminal Cases, O34.8 Possession of a Machine Gun (April 2024). None of Officer Collins's questions nor Defendant's answers show that Defendant knew the Glock with the switch was a machine gun or was aware of the gun's characteristics that made it a machine gun. Officer Collins's questions may have established that Defendant possessed the weapon, but possession is only one of the two elements the government must establish to convict Defendant under 18 U.S.C. § 922(o). *Cf. United States v. Ray*, 690 F. App'x 366, 371 (6th Cir. 2017) ("*Ray II*") (first factor suggested *Miranda* warnings were ineffective because officers asked the defendant pre-*Miranda* about his possession and ownership of the guns and whether he had been to jail before, which were "the only questions relevant to a felon-in-possession charge" (cleaned up)).

Because Officer Collins's questioning at the scene was brief and did not address whether Defendant knew that the Glock with the switch was a "machine gun" or had the characteristics of a "machine gun," this factor is either neutral or weighs only slightly in Defendant's favor.

*Overlapping Content of Statements Made during the First and Second Rounds of Interrogation*. There is some overlap between Defendant's pre-*Miranda* statements at the scene and his post-*Miranda* statements at the station because Defendant said the Glock with the switch belonged to him in both instances. But the post-*Miranda* questioning at the station did not pick

6

up where the pre-*Miranda* questioning left off. *Cf. United States v. Ashmore*, 609 F. App'x 306, 317–18 (6th Cir. 2015).

Sergeant Pellet began his questioning at the station by asking Defendant what happened that day. Defendant responded, "we got pulled over." And instead of immediately asking Defendant about the traffic stop or what was found, Sergeant Pellet next asked Defendant several questions about who he was with, who was driving, how he knew the individuals in the car, and where they were going. After that, Sergeant Pellet circled back to what happened after the car was pulled over but, again, he did not bring up the gun. Instead, he asked if Defendant knew what the officers found in the car. Only after Defendant told Sergeant Pellet that the officers found a gun did Sergeant Pellet inquire about whose gun it was and if it belonged to Defendant. Defendant then told Sergeant Pellet that he "told them" it was his gun. It was only after Defendant's mention of his prior statement that Sergeant Pellet then asked follow-up style questions about the gun, covering what the gun looks like, what caliber the gun is, where Defendant got the gun, how much he paid for it, how long Defendant had the gun, whether Defendant had shot the gun before, whether there was a switch or button on the gun, and Defendant's knowledge of how the switch modified the gun's operation.

Like the first factor, this factor is either neutral or weighs partially in Defendant's favor.

*Timing and Settings of the Two Rounds of Interrogation*. Defendant's pre-*Miranda* statements were made at the scene of the traffic stop approximately three and a half hours before Sergeant Pellet began his interrogation of Defendant at the police station. For some of that time, Defendant was detained in the back of a police car at the scene. Eventually, Defendant was transported to the police station and placed in an interview room. He then had to wait in the interview room for some time while Sergeant Pellet interviewed two of the other individuals that

7

were in the car.  The different settings of the interrogations and the substantial gap in time between them weigh against Defendant.

*Continuity of Police Personnel During the Two Interrogations*.  There was some practical continuity of police personnel during the interrogations because Officer Collins and Sergeant Pellet both work for the MPD, and Sergeant Pellet had knowledge of Defendant's unwarned statements.  But neither Sergeant Pellet nor Agent Blakely participated in the traffic stop and neither was at the scene where Defendant was first questioned.  And Sergeant Pellet never told Defendant that he knew about Defendant's earlier statement.  The continuity here was minimal, so this factor is either neutral or weighs slightly against Defendant.

*Degree to which Interrogator's Questions Treated the Second Round as Continuous with the First*.  Sergeant Pellet "did not treat the pre- and post-*Miranda* periods as a single interrogation," nor did he "exploit [Defendant's] unwarned admission to pressure him into speaking a second time."  *Woolridge*, 64 F.4th at 761 (citing *Oregon v. Elstad*, 470 U.S. 298, 316 (1985)).  Instead, Sergeant Pellet "began his questioning anew."  *Id.* (cleaned up).  This factor weighs strongly against suppression.

Overall, the *Seibert* factors here are mixed.  But the Court does not consider them with a "blinkered focus."  *Id.* at 762.  Instead, the Court looks at them in the context of the surrounding circumstances.  And here, those circumstances show that Defendant understood "he had a genuine choice to continue speaking." *Id.* at 760 (citing *Seibert*, 542 U.S. at 611–12 & n.4).

The circumstances here lack "the coercive qualities that undermined the *Miranda* warnings in *Seibert*."  *Id.* at 760.  The officers did not use coordinated questioning, Sergeant Pellet did not

exploit Defendant's unwarned statements or use other coercive tactics.[3] Sergeant Pellet did not even let on that he knew about Defendant's unwarned statements. Sergeant Pellet gave Defendant a waiver of rights form, had him read it aloud, asked if he had any questions about his rights and if understood them, and then asked him to initial the form beside each of the rights he had just read. After, Sergeant Pellet asked Defendant, "keeping your rights in mind, do you want to talk to us about what's going on today?" Defendant responded by saying that he did not know what was going on, and Sergeant Pellet told him, "we don't either. That's why we're trying to talk to you." There was a brief exchange between Sergeant Pellet and Defendant about Defendant being tired and wanting to leave. Sergeant Pellet told Defendant that he could tell he was tired, and he asked again if Defendant wanted to talk to them. Defendant responds "sure," and Sergeant Pellet asks him to read the next paragraph on the waiver of rights form. After reading that paragraph aloud, Sergeant Pellet asked Defendant to sign and date the form at the bottom.

In sum, the facts here show that Defendant understood he had a choice about whether he wanted to talk to Sergeant Pellet and Agent Blakely at the station.

2.      **Was Defendant's waiver knowing and voluntary?**

Defendant understood he had a choice about whether he wanted to speak with Sergeant Pellet and Agent Blakely. And he chose to speak with them after waiving his *Miranda* rights. The next question then is whether that waiver was knowing and voluntary.

---

[3] The lack of coercion is highlighted by the multiple opportunities Sergeant Pellet and Agent Blakely gave Defendant to disavow that the gun was his. At one point, Agent Blakely tells Defendant that his story does not seem to make sense, and that he is confused about why Defendant does not know where the gun was found. He then asked, "is it not your gun?" Defendant reiterates that he told them it was his gun, to which Sergeant Pellet responds saying, "we know you told it was your gun, but is it your gun?" And then later Agent Blakely asks, "did they tell you to take this charge?" Defendant reiterated it was his gun, prompting Sergeant Pellet to ask, "you sure?"

A "waiver is voluntary when it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. It is intelligent when it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Ramamoorthy*, 949 F.3d 955, 964–65 (6th Cir. 2020) (cleaned up). The court makes those determinations based on the totality of the circumstances viewed "primarily from the perspective of the police." *Id.* (cleaned up). If "the police had no reason to believe that the defendant misunderstood the warnings," then "there is no basis for invalidating the *Miranda* waiver." *Id.* (cleaned up).

As discussed above, Sergeant Pellet gave Defendant the waiver of rights form and asked him to read each of the rights aloud. He did so, and then Sergeant Pellet asked Defendant if he had any questions about his rights and if he understood his rights. After Defendant confirmed he did not have any questions and understood his rights, Sergeant Pellet returned the form to him and asked him to initial each of the rights he had just read.

After that, Sergeant Pellet asked "keeping your rights in mind, do you want to talk to us about what's going on today?" Defendant responded by saying that he did not know what was going on, and Sergeant Pellet told him, "we don't either. That's why we're trying to talk to you." There was a brief exchange between Sergeant Pellet and Defendant about Defendant being tired and wanting to leave. Sergeant Pellet told Defendant that he could tell he was tired, and he asked again if Defendant wanted to talk to them. Defendant responds "sure," and Sergeant Pellet asks him to read the next paragraph on the waiver of rights form. After reading that paragraph aloud, Sergeant Pellet asked Defendant to sign and date the form at the bottom.

After reviewing the video of Sergeant Pellet's interrogation, there is nothing that would have indicated to Sergeant Pellet or Agent Blakely that Defendant did not understand his rights or

the consequences of waiving them.  The circumstances do not indicate that Defendant's waiver was anything but voluntary.

It is true that Defendant appeared to be tired or sleepy during Sergeant Pellet's interrogation, but not so much that it impaired his ability to understand his rights or the consequences of waiving them.  Nor is there any indication that police were attempting to coerce Defendant by keeping him awake.  When Sergeant Pellet began his interrogation, it was about 9:30 p.m., and Defendant had been in custody for a little under four hours—neither of those things suggests an attempt to coerce or intimidate Defendant.

Because Sergeant Pellet and Agent Blakely had no reason to believe that Defendant misunderstood his *Miranda* rights or the consequences of waiving them, "there is no basis for invalidating the *Miranda* waiver."  *Ramamoorthy*, 949 F.3d at 965 (cleaned up).  Defendant's waiver of his rights was knowing and voluntary.

## CONCLUSION

For the reasons set forth above, Defendant's objections (ECF NO. 64) are **OVERRULED**.  The Chief Magistrate Judge's Report and Recommendation (ECF No. 56) is **ADOPTED**.  Defendant's motion to suppress (ECF Nos. 36 & 51) is **DENIED**.

**IT IS SO ORDERED**, this 2nd day of June, 2025.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE